UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

SHELBY CAMPBELL,

*Plaintiff,*
v.

UNIVERSITY OF DETROIT MERCY;
UNIVERSITY OF DETROIT MERCY SCHOOL OF LAW;

*Defendants.*

Case: 2:26−cv−10484
Assigned To : Goldsmith, Mark A.
Referral Judge: Grand, David R.
Assign. Date : 2/10/2026
Description: CMP CAMPBELL v
UNIVERSITY OF DETROIT
MERCY ET AL (JP)

## COMPLAINT AND JURY DEMAND

### INTRODUCTION

1. Plaintiff Shelby Campbell, by and through herself, for her Complaint against Defendants, alleges as follows:

2. This action arises from Defendants' retaliation against Plaintiff, a law student who engaged in protected activity by raising concerns regarding Defendants' financial aid practices, academic billing, and compliance with federal law.

3. After Plaintiff questioned and challenged Defendants' handling of federal financial aid, transcript practices, and representations that certain repeated courses would be provided "at no cost," Defendants subjected Plaintiff to heightened scrutiny, initiated disciplinary proceedings, and ultimately removed Plaintiff from

1

the University of Detroit Mercy School of Law through an involuntary medical leave.

4. Defendants did not engage in an interactive accommodation process, did not provide reasonable accommodations, and did not afford Plaintiff the procedural protections promised in Defendants' own policies. Instead, Defendants cancelled an ongoing disciplinary process and relied on non-diagnostic characterizations of Plaintiff's mental health to justify her exclusion.

5. These actions occurred shortly after Plaintiff's protected complaints and requests for records and resulted in Plaintiff's exclusion from her legal education, denial of access to required clinical education, loss and delay of federal financial aid benefits, and substantial financial and professional harm.

6. Plaintiff brings this action to redress disability discrimination, retaliation for protected activity, breach of contract, fraud and misrepresentation, and related violations of federal and Michigan law, and to obtain declaratory and injunctive relief to correct Defendants' unlawful practices.

## I. JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Americans with Disabilities Act (42 U.S.C. § 12101 et seq.), the Rehabilitation Act of 1973 (29 U.S.C. § 794), and federal law governing higher education and student financial aid.

8. This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367, as those claims form part of the same case or controversy.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because:

    a. All or a substantial part of the events giving rise to Plaintiff's claims occurred in this District; and

    b. Defendants reside in or conduct substantial business within this District.

## II. PARTIES

10. Plaintiff Shelby Campbell is an individual and former law student who was enrolled at the University of Detroit Mercy School of Law.

11. Defendant University of Detroit Mercy is a private university located in Detroit, Michigan. At all relevant times, it received federal financial assistance and exercised institutional authority over academic governance and student policies.

12. Defendant University of Detroit Mercy School of Law is a constituent professional school of the University of Detroit Mercy and was responsible for Plaintiff's academic progress, discipline, clinical education, and enrollment status.

3

### III. STATEMENT OF FACTS

**A. Plaintiff's Enrollment and Early Financial Aid Concerns**

13. Plaintiff Shelby Campbell enrolled at the University of Detroit Mercy School of Law ("Detroit Mercy Law") to pursue a Juris Doctor degree.

14. From the outset of Plaintiff's enrollment, Defendants' administration of federal financial aid raised concerns. Plaintiff and other students were informed that federal financial aid funds could not be used to purchase required textbooks, despite such expenses ordinarily being included within a student's cost of attendance under federal financial aid regulations.

15. Plaintiff questioned these representations and sought clarification regarding Defendants' handling of federal financial aid and compliance with applicable law.

16. Plaintiff is a parent and primary caregiver. Defendants were aware of Plaintiff's parental status, financial vulnerability, and first-generation student status, including that Plaintiff lacked family financial support.

**B. Representations Regarding Cost of Repeated Coursework**

17. During Plaintiff's enrollment at the University of Detroit Mercy School of Law, Defendants made specific representations regarding the financial treatment of repeated coursework.

18. Phil Krauss, a senior administrator with authority over academic advising and student enrollment matters, informed Plaintiff that certain repeated courses would be provided "at no cost." Krauss communicated this representation directly to

4

Plaintiff during an in-person meeting in his office, in the context of advising Plaintiff regarding academic progress and course repetition.

19. At the time these representations were made, Defendants' published student handbooks and academic materials likewise stated or reflected that repeated coursework under specified circumstances would not require additional tuition payment. These representations were conveyed to students as institutional policy and were relied upon by Plaintiff in making enrollment and academic decisions.

20. Defendants exercised exclusive control over tuition billing, application of federal financial aid funds, transcript notation, and internal academic record-keeping. Plaintiff had no independent ability to verify how repeated coursework would be billed or recorded other than through Defendants' representations and official publications.

21. Relying on these representations, Plaintiff remained enrolled, repeated coursework as directed, and continued to apply federal financial aid toward her education under the belief that repeated courses would not result in additional tuition charges or adverse academic consequences.

22. After Plaintiff raised concerns regarding grading practices, financial aid administration, and institutional compliance, Defendants altered or applied billing and transcript practices in a manner inconsistent with the prior representations.

23. Defendants assessed tuition and applied financial aid funds to repeated coursework despite earlier assurances that such courses would be provided at no cost.

24. Plaintiff later learned that Defendants modified or revised handbook language and internal practices after her removal from the program in a manner that obscured or contradicted the representations previously made to her and other students regarding repeated coursework.

25. As a result of Defendants' representations and subsequent conduct, Plaintiff incurred unexpected financial obligations, adverse transcript treatment, and disruption to her academic progress.

**C. Systemic Course Grading Irregularities During Plaintiff's First Year**

26. During Plaintiff's first year, Defendants implemented a newly required course taught by multiple professors across several sections.

27. After completion of the course, Defendants altered or adjusted grading outcomes in a manner that affected a substantial number of students.

28. More than fifty percent of the first-year class signed a petition objecting to the grading changes and requesting transparency and review.

29. Thirty-six students, including Plaintiff, formally appealed their grades pursuant to Defendants' academic policies. These appeals involved grading decisions made by at least six different professors.

30. Despite the individualized nature of the appeals, Defendants denied each appeal using materially identical, generic responses, without addressing the specific grading concerns raised by individual students.

31. Defendants modified or added stages to the appeal process during its pendency in a manner that benefitted Defendants.

**D. Plaintiff's Personal Crisis and Request for Institutional Support**

32. During the summer of 2024, Plaintiff was undergoing a separation and experiencing significant financial instability. Plaintiff's credit was negatively impacted as she was forced to choose between continuing law school and returning to physically demanding assembly-line work.

33. Plaintiff disclosed these circumstances to Ieisha Humphrey, then Associate Dean for Student Affairs, and sought guidance regarding academic options, financial aid issues, and institutional support.

34. Rather than engaging in an interactive process or exploring accommodations, or academic assistance, Humphrey recommended only that Plaintiff take a leave of absence.

35. Plaintiff declined a leave of absence because it would further delay her progress toward graduation.

**E. Fall 2024 Academic Difficulties and Grade Dispute**

36. During the Fall 2024 semester, Plaintiff inadvertently failed to complete required quizzes in her Constitutional Law course. Upon realizing the omission,

7

Plaintiff promptly contacted the professor to seek guidance regarding whether the issue could be addressed.

37. In January 2025, Plaintiff was notified that she had failed the Constitutional Law course. Plaintiff formally appealed the failing grade pursuant to Defendants' academic policies. Defendants denied the appeal without providing a substantive answer.

38. Plaintiff requested clarification regarding how the grade was calculated, including how a numerical grade of 1.5 was derived. Defendants refused to provide an explanation. Plaintiff thereafter submitted a Freedom of Information Act request seeking records reflecting how the grade calculation was determined. Defendants did not provide a meaningful response explaining the calculation.

39. Plaintiff further questioned why, if the course failure rendered her academically deficient, she was nonetheless permitted to continue receiving federal financial aid in subsequent terms without being required to pursue a satisfactory academic progress appeal, as would ordinarily be required under federal financial aid regulations. Defendants did not provide an explanation.

**F. Escalation Following Plaintiff's Protected Activity**

40. Following Plaintiff's appeals and continued inquiries regarding grading and financial aid, Plaintiff again sought assistance from Humphrey, who was aware of Plaintiff's family circumstances, financial instability, and first-generation student status.

41. Humphrey responded dismissively and did not offer support, accommodations, or guidance.

42. Plaintiff continued reviewing her academic records and identified discrepancies in transcript formatting and grade notation that differed from semesters in which she had passed all courses.

43. Plaintiff requested clarification regarding how her Constitutional Law grade was calculated, including how a numerical grade of 1.5 constituted a failing grade. Defendants refused to provide an explanation.

44. Instead, Defendants warned Plaintiff that she could be charged with unauthorized practice of law for assisting her mother with formatting pro se court documents in an Illinois child-support matter.

45. Plaintiff's mother contacted Humphrey directly to confirm that Plaintiff was not representing her as an attorney.

**G. Social Media, Disciplinary Action, and Involuntary Medical Leave**

46. Plaintiff later learned that unnamed individuals had raised concerns regarding her conduct. Plaintiff publicly criticized these allegations on social media.

47. Humphrey asserted that a meeting regarding Plaintiff's conduct was mandatory, then cancelled the meeting and stated that Plaintiff's speech was harmful.

48. Professor Andrew Moore authored or contributed to allegations that Plaintiff violated the Community Standards Code based on her speech and advocacy.

49. Erin Archerd, Associate Dean of Academic Affairs, issued a formal Notice of Community Standards Violation, initiating disciplinary proceedings and scheduling a hearing.

50. While the disciplinary proceedings were pending, Humphrey placed Plaintiff on involuntary medical leave.

51. The involuntary medical leave was based on alleged mental health concerns using non-diagnostic labels such as "manic" or "paranoid," while expressly acknowledging that no formal diagnosis had been made.

52. Defendants did not conduct an individualized medical or psychological evaluation, did not engage in an interactive process, and did not provide Plaintiff with a meaningful opportunity to contest the allegations before removal.

53. Upon imposing involuntary medical leave, Defendants cancelled the disciplinary proceedings.

54. Defendants conditioned Plaintiff's return on obtaining mental health clearance and imposed restrictions on Plaintiff's speech, including demands related to her social media activity.

55. Plaintiff was barred from entering the law school building and instructed to arrange a Public Safety escort to retrieve personal property.

**H. Financial Aid Reporting, Withdrawal Status, and Refund Irregularities**

56. Following Plaintiff's removal, Defendants reported Plaintiff as withdrawn from the University rather than on a leave of absence, triggering federal student loan repayment obligations.

57. Approximately one week later, Plaintiff was placed on a financial aid refund list, despite Plaintiff not having paid approximately $19,000 in tuition out of pocket.

58. Main campus financial aid personnel informed Plaintiff that the refund related to federal financial aid funds, contradicting representations made by the law school.

59. Defendants offered to release Plaintiff from the program and award academic credit if she agreed not to return.

60. At the time of Defendants' actions, Plaintiff had completed approximately sixty-seven credit hours and planned to graduate in November 2025.

**I. Denial of Required Clinical Education**

61. Before Plaintiff's removal, she applied for participation in a required law clinic.

62. Rebecca Nowak declined to assist Plaintiff and advised her to reapply "like a job," despite clinical participation being a mandatory graduation requirement.

63. Defendants' actions denied Plaintiff access to required clinical education and prevented timely completion of her degree.

11

**J. Reporting, Tax Documentation, and Necessity of Filing**

64. After her removal, Plaintiff retained access to law school resources and conducted extensive research into Defendants' financial aid practices.

65. Plaintiff reported her concerns to multiple oversight agencies. In August 2025, Plaintiff received correspondence from the Internal Revenue Service Tax Fraud Hotline instructing her to submit documentation related to Defendants' conduct.

66. During the 2025 tax filing season, Defendants refused to provide Plaintiff with a Form 1098-T. Instead, Defendants stated that Plaintiff's tax information had been "updated for 2024" and instructed Plaintiff to consult a tax professional, without providing corrected documentation.

67. This refusal directly impacted Plaintiff's ability to comply with federal tax obligations and obtain education-related tax benefits, further exacerbating her financial harm.

68. Plaintiff had intended to resolve these matters without litigation and initially relied on counsel to pursue her claims. However, Plaintiff's retained attorney— who was responsible for representing her interests—is now under investigation by the Attorney Grievance Commission in Michigan. (AGC # 25-2449)

69. Plaintiff previously entered into a settlement agreement with Defendants while represented by counsel, the enforceability of which is disputed.

70. In light of Defendants' continuing conduct, the refusal to provide required tax documentation, the ongoing financial and regulatory consequences, and the

absence of effective legal representation, Plaintiff determined that immediate legal action was necessary to preserve her rights, prevent further harm, and seek accountability.

71. Accordingly, Plaintiff brings this action now, as continued delay would compound the injuries already suffered and risk the loss of statutory and procedural protections.

## IV. CAUSES OF ACTION

### COUNT I
### ADA / Rehabilitation Act

72. Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibit covered entities from excluding a qualified individual with a disability, or an individual regarded as having a disability, from participation in or denying the benefits of services, programs, or activities by reason of disability. Discrimination under these statutes occurs when an entity denies a qualified individual full and equal access to its programs or services based on an actual or perceived impairment. *School Bd. of Nassau Cnty.* v. *Arline*, 480 U.S. 273, 284–89 (1987).

73. Mental health conditions such as anxiety and depression may constitute disabilities within the meaning of the ADA and the Rehabilitation Act when they substantially limit one or more major life activities, including concentrating,

sleeping, and managing stress. *Kaltenberger* v. *Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 435–36 (6th Cir. 1998). In addition, an individual is protected under both statutes when a covered entity regards the individual as having a disabling impairment, regardless of whether the impairment substantially limits a major life activity. *Demyanovich* v. *Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 434 (6th Cir. 2014).

74. Courts have consistently held that educational institutions may not rely on stereotypes, assumptions, or generalized concerns about mental health to justify adverse action. Instead, institutions must conduct an individualized assessment of the student's ability to participate in academic programs and must engage in an interactive process to determine whether reasonable accommodations would permit continued participation. See *Arline*, 480 U.S. at 287; *Kaltenberger*, 162 F.3d at 437.

75. Excluding a student from academic programs, placing the student on involuntary medical leave, or conditioning continued enrollment on mental health clearance—without an individualized assessment or meaningful consideration of reasonable accommodations—constitutes denial of full and equal access to educational services by reason of disability. *Doe* v. *Univ. of Mich.*, 721 F. Supp. 852, 857–59 (E.D. Mich. 1989); *Moe* v. *E. Mich. Univ.*, No. 10-10961, 2011 WL 3608639, at 6–8 (E.D. Mich. Aug. 16, 2011).

76. Accordingly, when an educational institution removes an otherwise qualified student from its academic programs based on an actual or perceived mental impairment, rather than engaging in an individualized, accommodation-focused inquiry, such conduct constitutes discrimination in violation of Title III of the ADA and Section 504 of the Rehabilitation Act.

77. Here, Plaintiff has anxiety and depression, which constitute mental impairments that substantially limit one or more major life activities, including concentrating, sleeping, and managing stress. Plaintiff therefore qualifies as an individual with a disability within the meaning of the ADA and the Rehabilitation Act.

78. Independently, Defendants regarded Plaintiff as having a disabling mental impairment. Defendants repeatedly characterized Plaintiff as "manic," "paranoid," or mentally unstable, relied on alleged mental health concerns to justify adverse action, and imposed an involuntary medical leave despite the absence of any medical diagnosis or individualized assessment. These actions demonstrate that Defendants treated Plaintiff as disabled based on perceived mental impairment, triggering statutory protection even apart from Plaintiff's actual disability.

79. Plaintiff was otherwise qualified to continue her legal education and to participate in Defendants' academic programs with or without reasonable accommodations. Rather than engaging in the required interactive process or considering reasonable accommodations, Defendants removed Plaintiff from the

15

law school, cancelled disciplinary proceedings, denied Plaintiff access to required academic and clinical programs, and conditioned Plaintiff's return on obtaining mental health clearance.

80. By excluding Plaintiff from participation in academic programs and denying her the benefits of Defendants' educational services based on actual and/or perceived disability—without conducting an individualized assessment or providing reasonable accommodations—Defendants denied Plaintiff full and equal access to educational programs in violation of Title III of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

## <u>COUNT II</u>
### The Michigan Persons with Disabilities Civil Rights Act

81. The Michigan Persons with Disabilities Civil Rights Act ("PWDCRA"), MCL 37.1101 et seq., prohibits an educational institution from discriminating against an individual with a disability, or an individual regarded as having a disability, by denying the individual the full and equal utilization of educational services, facilities, or opportunities because of the disability. MCL 37.1402(b). Discrimination occurs when an educational institution excludes a qualified individual from participation in, or denies the benefits of, its educational programs or services on the basis of an actual or perceived impairment.

82. Under the PWDCRA, a "disability" includes a determinable physical or mental characteristic that substantially limits one or more major life activities, as well as a

16

characteristic that is perceived as substantially limiting. MCL 37.1103(d). The statute therefore protects individuals who have an actual disability and those who are regarded as having a disability, regardless of whether the perceived impairment is supported by a medical diagnosis. Michigan courts have recognized that the PWDCRA is to be construed broadly to effectuate its remedial purpose of eliminating discrimination against individuals with disabilities. See *Chiles* v. *Machine Shop, Inc.,* 238 Mich. App. 462, 474 (1999).

83. Courts have further held that educational institutions may not rely on assumptions, stereotypes, fear, or generalized concerns about mental health to justify adverse action against a student. Rather, exclusion from educational services must be based on legitimate, non-discriminatory reasons and, where disability is implicated, must reflect an individualized assessment of the student's ability to utilize and benefit from the institution's programs and services. This principle mirrors longstanding federal disability law interpreting parallel protections under Section 504 of the Rehabilitation Act and the Americans with Disabilities Act. See *School Bd. of Nassau Cnty.* v. *Arline,* 480 U.S. 273, 284–87 (1987).

84. Federal courts in Michigan have repeatedly emphasized that universities violate disability-discrimination statutes when they remove or exclude students based on perceived psychological instability without individualized inquiry or procedural safeguards. See *Doe* v. *Univ. of Mich***.**, 721 F. Supp. 852, 857–59 (E.D. Mich. 1989)

(holding that exclusion based on perceived mental health concerns, without individualized assessment, violates disability protections); see also *Moe* v. *E. Mich. Univ.*, No. 10-10961, 2011 WL 3608639, at 6–8 (E.D. Mich. Aug. 16, 2011).

85. Here, Plaintiff has anxiety and depression, which constitute mental impairments within the meaning of the Michigan Persons with Disabilities Civil Rights Act. These conditions affect Plaintiff's ability to manage stress, concentrate, and engage in daily functioning and therefore qualify as disabilities under the statute. See *Chiles*, 238 Mich. App. at 474 (recognizing mental impairments as covered disabilities where they affect major life activities).

86. Independently, Defendants regarded Plaintiff as having a mental impairment. Defendants repeatedly characterized Plaintiff as mentally unstable and relied on alleged mental health concerns to justify adverse action, including involuntary medical leave and exclusion from academic programs. Such conduct constitutes "regarded as" discrimination under the PWDCRA, which protects individuals subjected to adverse treatment based on perceived disability regardless of medical confirmation. See *Arline*, 480 U.S. at 284–89.

87. Plaintiff was otherwise able to utilize and benefit from Defendants' educational services, facilities, and opportunities, including continued enrollment, coursework, and required clinical education. Plaintiff was not academically disqualified and remained capable of participating in Defendants' educational programs with or without reasonable support. Michigan and federal courts have recognized that

where a student is otherwise qualified, exclusion based on disability-related concerns must be justified by individualized, evidence-based determination rather than speculation. See *Doe,* 721 F. Supp. at 857–59.

88. Nonetheless, Defendants denied Plaintiff the full and equal utilization of educational services by placing her on involuntary medical leave, excluding her from academic programs, and conditioning her return on mental health clearance. These actions were not based on a legitimate academic determination or an individualized assessment of Plaintiff's ability to participate in educational programs, but instead were taken because of Plaintiff's actual and/or perceived mental impairment. As in *Doe* and *Moe*, Defendants' reliance on generalized mental health concerns and stigmatizing characterizations, rather than lawful process, supports a finding of disability discrimination.

89. By excluding Plaintiff from educational services and conditioning continued participation on mental health clearance because of actual or perceived disability, Defendants denied Plaintiff the full and equal utilization of educational services, facilities, and opportunities in violation of the Michigan Persons with Disabilities Civil Rights Act, MCL 37.1101 et seq.

## COUNT III
### Failure to Accommodate

90. An educational institution violates Title III of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act, and the Michigan Persons

with Disabilities Civil Rights Act ("PWDCRA") when it fails to make reasonable modifications to policies, practices, or procedures necessary to afford a qualified individual with a disability equal access to educational programs and services, unless the institution can demonstrate that the requested modification would fundamentally alter the nature of the program. See 42 U.S.C. § 12182(b)(2)(A)(ii); 29 U.S.C. § 794; MCL 37.1402(b).

91. A qualified individual with a disability is one who meets the essential eligibility requirements of the educational program, with or without reasonable accommodation. Educational institutions are required to engage in an interactive, individualized process to identify reasonable modifications that would permit continued participation. Exclusion or removal from an academic program may not be used as a substitute for reasonable accommodation unless the institution can establish that no reasonable modification would be effective or that the modification would fundamentally alter the program's essential requirements. See *Southeastern Cmty. Coll.* v. *Davis*, 442 U.S. 397, 406–13 (1979) (requiring individualized inquiry and rejecting blanket exclusion); *Alexander* v. *Choate*, 469 U.S. 287, 301–02 (1985).

92. The burden rests with the educational institution to demonstrate that a proposed accommodation would fundamentally alter the nature of the program. Absent such a showing, the failure to provide reasonable modifications that would afford equal

access constitutes discrimination under the ADA, the Rehabilitation Act, and the PWDCRA. See *School Bd. of Nassau Cnty.* v. *Arline*, 480 U.S. 273, 287 (1987).

93. The Sixth Circuit has repeatedly recognized that educational institutions violate disability-discrimination statutes when they fail to engage in the interactive process or when they remove students rather than exploring reasonable accommodations. See *Kaltenberger* v. *Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 437 (6th Cir. 1998). Federal courts in Michigan have likewise held that involuntary medical leave or exclusion imposed without individualized assessment or accommodation analysis may constitute unlawful disability discrimination. *Doe* v. *Univ. of Mich.*, 721 F. Supp. 852, 857–59 (E.D. Mich. 1989); *Moe* v. *E. Mich. Univ.*, No. 10-10961, 2011 WL 3608639, at 6–8 (E.D. Mich. Aug. 16, 2011).

94. Here, Defendants were aware that Plaintiff had anxiety and depression and, at a minimum, regarded Plaintiff as having a mental impairment requiring support or accommodation. Plaintiff's need for accommodation was known to Defendants and was further made apparent through Plaintiff's repeated requests for assistance, academic flexibility, and guidance during periods of documented personal and financial hardship. Such notice is sufficient to trigger an institution's obligation to engage in an interactive accommodation process. See *Kaltenberger*, 162 F.3d at 437.

95. Plaintiff was otherwise qualified to continue her legal education and to participate in Defendants' academic programs with reasonable accommodations.

Plaintiff met the essential eligibility requirements of the Juris Doctor program and remained capable of continued participation with appropriate support or temporary modification of academic policies. As the Supreme Court has emphasized, the proper inquiry focuses on whether the individual can meet program requirements with reasonable modification, not whether the institution prefers exclusion. See *Davis*, 442 U.S. at 406.

96. Rather than engaging in an interactive process or exploring reasonable modifications to academic policies, disciplinary procedures, or leave options, Defendants removed Plaintiff from the law school by imposing an involuntary medical leave. Defendants failed to consider or implement reasonable accommodations that would have allowed Plaintiff to continue her education, such as academic flexibility, support services, temporary adjustments, or structured leave consistent with Defendants' own policies. Instead, Defendants treated exclusion from the program as the default response, a practice courts have repeatedly rejected as inconsistent with disability law. See *Doe*, 721 F. Supp. at 857–59; *Moe*, 2011 WL 3608639, at 6–8.

97. Defendants did not determine, and cannot demonstrate, that providing reasonable accommodations would have fundamentally altered the nature of the Juris Doctor program. The record reflects no individualized assessment, no accommodation analysis, and no evidence-based finding that accommodation was infeasible. Under binding Supreme Court and Sixth Circuit precedent, the absence

22

of such a showing precludes reliance on the "fundamental alteration" defense. See *Arline*, 480 U.S. at 287; *Alexander*, 469 U.S. at 301–02.

98. Accordingly, Defendants' failure to provide reasonable accommodations and their denial of Plaintiff's equal access to educational programs and services constitute discrimination in violation of the ADA, the Rehabilitation Act, and the Michigan Persons with Disabilities Civil Rights Act.

## <u>COUNT IV</u>
### Unlawful Medical Leave / Procedural Breach

99. An educational institution breaches its contractual and procedural obligations when it removes a student through involuntary medical leave without adhering to the procedures, safeguards, and standards set forth in its published policies, student handbook, or governing documents. Under Michigan law, a student handbook and related academic policies may constitute a binding contract between the institution and the student, and the institution is required to substantially comply with the procedural protections it promises therein. See *Doe* v. *Univ. of Mich.*, 721 F. Supp. 852, 857–58 (E.D. Mich. 1989); *Schneider* v. *Plymouth State Univ.*, 744 F. Supp. 2d 447, 459 (D.N.H. 2010) (recognizing handbook-based contractual obligations in academic settings); see *also Rowe* v. *Montgomery Ward & Co.*, 437 Mich. 627, 639–40 (1991) (recognizing enforceability of policy-based contractual commitments under Michigan law).

100. Where an institution's policies require notice, an opportunity to be heard, and individualized decision-making before adverse academic action is taken, the failure to provide those protections constitutes a procedural breach. Educational institutions may not bypass established disciplinary or academic processes, rely on informal or non-diagnostic characterizations of a student's mental health, or impose involuntary medical leave without following the procedures and safeguards outlined in their governing documents. Courts have emphasized that deviation from promised procedures, particularly where removal or exclusion is imposed, may constitute a breach of contract and denial of procedural fairness. See *Doe*, 721 F. Supp. at 858–59.

101. Additionally, when an institution conditions a student's removal or return on medical clearance, it must do so pursuant to clearly articulated standards, timelines, and review procedures set forth in its policies. Arbitrary or ad hoc decision-making that deviates from published procedures constitutes a breach of contractual and procedural obligations. See *Faparusi* v. *Case W. Reserve Univ.*, 711 F. App'x 269, 274–75 (6th Cir. 2017) (recognizing that universities must follow their own procedures when exercising discretionary academic authority).

102. Federal courts have repeatedly held that involuntary medical leave imposed without individualized assessment, objective evidence, or adherence to institutional procedures raises serious contractual and procedural concerns. *See Doe*, 721 F.

Supp. at 857–59; *Moe* v. *E. Mich. Univ.*, No. 10-10961, 2011 WL 3608639, at 6–8 (E.D. Mich. Aug. 16, 2011).

103. Here, Defendants removed Plaintiff from the University of Detroit Mercy School of Law through an involuntary medical leave without adhering to the procedures, safeguards, and standards set forth in Defendants' student handbook, academic policies, and governing documents.

104. Defendants imposed involuntary medical leave while disciplinary proceedings against Plaintiff were pending, without providing Plaintiff adequate notice of the factual or procedural basis for the action, a meaningful opportunity to be heard, or an individualized assessment supported by objective evidence. Defendants did not conduct a formal medical or psychological evaluation and expressly acknowledged that no diagnosis had been made. Such action mirrors conduct that courts have found procedurally deficient and inconsistent with institutional obligations. See *Doe*, 721 F. Supp. at 858–59.

105. Rather than following the procedural framework promised to students, Defendants cancelled the pending disciplinary process, relied on non-diagnostic and stigmatizing characterizations of Plaintiff's mental health, and unilaterally removed Plaintiff from the program. Defendants further conditioned Plaintiff's return on obtaining medical clearance without identifying clear standards, timelines, or review procedures governing that determination. This type of ad hoc

decision-making is precisely the sort of procedural deviation that constitutes contractual breach. See *Faparusi,* 711 F. App'x at 274–75.

106. By failing to comply with their own published policies and by denying Plaintiff the procedural protections guaranteed therein, Defendants breached their contractual and procedural obligations. As a direct result of this breach, Plaintiff lost access to her legal education and related academic opportunities, causing concrete and substantial harm. See *Moe*, 2011 WL 3608639, at 6–8.

## COUNT V
### Retaliation

107. Federal and Michigan law prohibit retaliation against an individual for engaging in protected activity, including opposing discriminatory practices, requesting reasonable accommodations, or raising concerns regarding compliance with federal or state law. Retaliation occurs when an institution takes materially adverse action against an individual because the individual engaged in such protected activity.

108. The anti-retaliation provisions of the Americans with Disabilities Act, the Rehabilitation Act, and the Michigan Persons with Disabilities Civil Rights Act protect individuals who assert their rights under those statutes or who participate in processes designed to enforce compliance, including filing complaints, requesting records, submitting FERPA requests, or pursuing internal appeals. See 42 U.S.C. § 12203(a); 29 U.S.C. § 794(a); MCL 37.1602(a). An action is materially adverse if

it would deter a reasonable person from engaging in protected activity. See *Burlington N. & Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 68 (2006).

109. A plaintiff may establish retaliation through circumstantial evidence demonstrating a causal connection between the protected activity and the adverse action. Temporal proximity between protected activity and adverse action, escalation of scrutiny, deviation from ordinary procedures, and the severity or unusual nature of the adverse action may support an inference of retaliatory motive. See *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013); *A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697–98 (6th Cir. 2013).

110. The Sixth Circuit has recognized that retaliation claims under the ADA and Rehabilitation Act apply in educational settings and that adverse academic or disciplinary actions may constitute retaliation where they follow protected activity. See A.C., 711 F.3d at 697–99. Michigan courts similarly recognize retaliation under the PWDCRA where an individual is subjected to adverse treatment after opposing unlawful practices or asserting statutory rights. See *Bachman* v. *Swan Harbour Assocs.*, 252 Mich. App. 400, 435–36 (2002).

111. Here, Plaintiff engaged in protected activity when she raised concerns regarding Defendants' academic transparency, grading practices, financial aid administration, transcript irregularities, and compliance with federal and state law.

112. Plaintiff further engaged in protected activity by submitting FERPA requests, pursuing academic appeals, and seeking access to and correction of her educational

records. Such conduct constitutes protected activity under the ADA, the Rehabilitation Act, and the PWDCRA. *See* 42 U.S.C. § 12203(a); MCL 37.1602(a).

113. Plaintiff further engaged in protected activity by submitting Freedom of Information Act requests seeking records related to grading calculations, academic decision-making, and financial aid administration. Defendants denied or obstructed these requests without adequate explanation and provided only records already in Plaintiff's possession, while refusing to disclose responsive institutional records. Defendants' refusal to comply with lawful information requests further evidences retaliatory animus and an effort to deter Plaintiff from pursuing transparency and statutory rights.

114. After Plaintiff engaged in this protected activity, Defendants subjected her to a series of materially adverse actions. These actions included initiating disciplinary proceedings, escalating scrutiny of Plaintiff's conduct and speech, cancelling an ongoing disciplinary process, placing Plaintiff on involuntary medical leave, denying her access to required academic and clinical programs, restricting her speech, and reporting her as withdrawn for financial aid purposes. Each of these actions altered the terms, conditions, or benefits of Plaintiff's educational participation and would deter a reasonable student from engaging in similar protected activity. See *Burlington N.*, 548 U.S. at 68.

28

115. The adverse actions taken against Plaintiff occurred shortly after her protected complaints, record requests, and appeals and represented a marked departure from Defendants' ordinary procedures. Such close temporal proximity and procedural irregularity support a reasonable inference of retaliatory motive. See *A.C.*, 711 F.3d at 698; *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).

116. Viewed collectively, the timing, nature, and severity of Defendants' actions support a reasonable inference that Plaintiff's protected activity was a motivating factor in Defendants' decision-making. By escalating Plaintiff's complaints into disciplinary and medical actions and by imposing exclusionary measures shortly after Plaintiff asserted her rights, Defendants engaged in conduct that a reasonable fact finder could conclude was retaliatory.

117. By taking materially adverse action against Plaintiff because she engaged in protected activity, Defendants retaliated against Plaintiff in violation of the Americans with Disabilities Act, the Rehabilitation Act, the Michigan Persons with Disabilities Civil Rights Act, and Michigan public policy.

## COUNT VI
### Breach of Contract

118. Under Michigan law, the relationship between a student and a private educational institution is contractual in nature. The terms of that contract are supplied by the institution's student handbook, academic regulations, published policies, and official representations. An educational institution breaches the

29

contract when it fails to substantially comply with the promises, procedures, and standards set forth in those governing documents. *See Rowe* v. *Montgomery Ward & Co.*, 437 Mich. 627, 639–40 (1991) (recognizing enforceability of policy-based contractual obligations); *Doe* v. *Univ. of Mich.*, 721 F. Supp. 852, 857–58 (E.D. Mich. 1989).

119. Michigan courts have consistently held that where a university sets forth specific procedures governing grading, discipline, academic review, or student status, it is contractually obligated to follow those procedures in good faith. A deviation from promised procedures, particularly where it results in exclusion from an academic program or denial of degree progress, may constitute a breach of contract. *See Ewing* v. *Bd. of Regents of Univ. of Mich.*, 552 F. Supp. 881, 886–87 (E.D. Mich. 1982), *aff'd*, 742 F.2d 913 (6th Cir. 1984), *rev'd on other grounds*, 474 U.S. 214 (1985).

120. Courts further recognize that while educational institutions are afforded discretion in academic decision-making, that discretion does not permit arbitrary action or disregard of the institution's own published standards and procedures. See *Regents of Univ. of Mich.* v. *Ewing*, 474 U.S. 214, 225–26 (1985) (academic discretion must still be exercised in good faith and consistent with professional judgment).

121. Here, Plaintiff and Defendants entered into a contractual relationship governed by Defendants' student handbook, academic regulations, published

policies, and official representations regarding grading, discipline, financial aid, clinical education, and leave procedures. These materials formed the terms of the contract governing Plaintiff's enrollment and degree progression.

122. Defendants breached that contract by failing to follow their own promised procedures and standards. Among other things, Defendants failed to provide meaningful academic review of Plaintiff's grading appeals, altered or applied grading and transcript practices inconsistently, deviated from established disciplinary procedures, and imposed involuntary medical leave without adhering to the procedural safeguards set forth in Defendants' governing documents. Courts have recognized that such departures from established academic and disciplinary procedures may constitute contractual breach. See *Doe*, 721 F. Supp. at 857–59.

123. Defendants further breached the contract by denying Plaintiff access to required clinical education, misrepresenting the cost and academic treatment of repeated coursework, and administering financial aid in a manner inconsistent with Defendants' published representations. Where an institution conditions degree completion on mandatory coursework or clinical components, denial of access to those components without contractual or academic justification deprives the student of the benefit of the bargain. See *Ewing*, 552 F. Supp. at 886–87.

124. As a direct and proximate result of Defendants' breaches, Plaintiff was excluded from her educational program, lost the opportunity to complete degree requirements as promised, incurred financial harm, and suffered additional

damages. Defendants' failure to adhere to their own policies and representations therefore constitutes a breach of contract under Michigan law.

**COUNT VII**
**Implied Covenant**

125. Under Michigan law, every contract includes an implied covenant of good faith and fair dealing. This covenant requires that when a party is granted discretion under a contract, that discretion must be exercised honestly, reasonably, and in a manner consistent with the parties' justified expectations. A breach of the implied covenant occurs when a party exercises contractual discretion arbitrarily, unreasonably, or in bad faith so as to deprive the other party of the benefit of the bargain. See *Burkhardt* v. *City Nat'l Bank of Detroit*, 57 Mich. App. 649, 652–53 (1975).

126. Although Michigan law does not recognize an independent cause of action for breach of the implied covenant apart from a breach of contract, the covenant is enforceable where one party's discretionary conduct frustrates the contractual purpose or undermines the other party's right to receive the benefits of the agreement. See *Fodale* v. *Waste Mgmt. of Mich., Inc.*, 271 Mich. App. 11, 35 (2006); *Stephenson* v. *Allstate Ins. Co.*, 328 F.3d 822, 826 (6th Cir. 2003) (applying Michigan law). Where institutional policies, handbooks, or governing documents vest discretion in administrators, that discretion must be exercised in good faith and consistent with the contractual relationship between the parties.

127. Michigan courts have emphasized that the implied covenant is particularly relevant where one party possesses unilateral discretionary authority over matters affecting the other party's contractual rights. In such circumstances, the discretionary power may not be exercised in a manner that defeats the reasonable expectations created by the contract. See *Burkhardt*, 57 Mich. App. at 652–53.

128. Here, Defendants exercised discretion under the student handbook, academic policies, and administrative procedures governing Plaintiff's enrollment. That discretion included authority over academic evaluation, grading and transcript practices, disciplinary processes, medical leave decisions, access to required clinical education, and administration of enrollment and financial aid status.

129. Rather than exercising this discretion in good faith to facilitate Plaintiff's continued education and completion of degree requirements, Defendants used their discretionary authority in a manner that was arbitrary, unreasonable, and inconsistent with the purpose of the contractual relationship. Defendants selectively enforced policies, altered or obscured grading and transcript practices, denied Plaintiff meaningful review of academic appeals, and substituted involuntary medical leave for established disciplinary and academic procedures. Such conduct reflects the type of arbitrary discretionary action that Michigan courts have held violates the implied covenant of good faith and fair dealing. See *Burkhardt*, 57 Mich. App. at 652–53.

130. Defendants further exercised discretion in bad faith by conditioning Plaintiff's return on vague and undefined requirements, restricting Plaintiff's speech, denying access to required clinical education, and administering Plaintiff's withdrawal and financial aid status in a manner that deprived her of the benefits of enrollment. These actions were not taken to advance legitimate academic objectives but instead operated to frustrate Plaintiff's ability to complete the Juris Doctor program and to receive the educational benefits promised under the enrollment agreement. Courts applying Michigan law have found that discretionary conduct which undermines the core purpose of the contract constitutes bad faith. See *Fodale*, 271 Mich. App. at 35.

131. Through this pattern of arbitrary and bad-faith decision-making, Defendants deprived Plaintiff of the benefit of the bargain inherent in her enrollment at the University of Detroit Mercy School of Law. Defendants therefore breached the implied covenant of good faith and fair dealing under Michigan law.

## COUNT VIII
### Denial of Clinical Education

132. An educational institution breaches its contractual and statutory obligations when it denies a student access to required academic or clinical components of a degree program without lawful or legitimate academic justification, thereby preventing the student from completing degree requirements or obtaining the benefits of enrollment. Where an institution's published academic policies and

program requirements identify specific coursework or clinical education as mandatory for graduation, the institution is obligated to administer access to those requirements in a manner consistent with its contractual representations and governing standards. *Regents of the Univ. of Mich.* v. *Ewing*, 474 U.S. 214, 225–26 (1985) (recognizing contractual and constitutional limits on academic discretion).

133. An institution may not arbitrarily deny access to required academic or clinical components absent academic disqualification, individualized assessment, or compliance with established procedures. Exclusion from mandatory program elements that are necessary to satisfy degree requirements constitutes a denial of educational benefits and may give rise to both contractual and statutory violations. Courts have recognized that while institutions retain discretion in academic matters, that discretion does not permit exclusion that is arbitrary, procedurally deficient, or inconsistent with published academic requirements. See *Ewing*, 474 U.S. at 225; *Doe v. Univ. of Mich.*, 721 F. Supp. 852, 857–59 (E.D. Mich. 1989).

134. Here, Defendants' Juris Doctor program requires successful completion of clinical education as a mandatory component of graduation. Participation in approved clinical programs is a condition precedent to obtaining the Juris Doctor degree and is expressly represented as such in Defendants' academic policies, accreditation materials, and program descriptions. Courts have treated such representations as enforceable components of the student–institution contract. See

*Ewing* v. *Bd. of Regents of Univ. of Mich.*, 552 F. Supp. 881, 886–87 (E.D. Mich. 1982), *aff'd*, 742 F.2d 913 (6th Cir. 1984).

135. Plaintiff sought to participate in required clinical programs in order to satisfy degree requirements and to timely complete her legal education. Plaintiff was otherwise eligible to enroll in and complete clinical education and was not subject to any legitimate academic disqualification that would have precluded participation. Federal courts have recognized that where a student remains academically eligible, denial of access to required program components may constitute a breach of contract and unlawful exclusion. See Doe, 721 F. Supp. at 858–59.

136. Nonetheless, Defendants denied Plaintiff access to required clinical education without lawful or academic justification. Despite clinic participation being mandatory for graduation, Defendants failed to provide Plaintiff meaningful assistance in securing clinical placement, imposed arbitrary barriers to participation, and ultimately excluded Plaintiff from clinical opportunities as part of the actions that removed her from the program. Such exclusion mirrors conduct courts have found inconsistent with institutional obligations where access to required coursework or experiential components is withheld without individualized academic justification. See *Moe v. E. Mich. Univ.*, No. 10-10961, 2011 WL 3608639, at 6–8 (E.D. Mich. Aug. 16, 2011).

137. Defendants' denial of access to required clinical education was inconsistent with Defendants' published academic policies and contractual representations and was not based on any individualized assessment of Plaintiff's academic ability or fitness to participate. Rather, Defendants' actions operated to prevent Plaintiff from satisfying mandatory degree requirements, effectively foreclosing her ability to complete the Juris Doctor program. Courts have recognized that denial of access to required program elements may constitute denial of educational benefits under both contract and civil rights frameworks. See *Ewing*, 474 U.S. at 225–26; *Doe*, 721 F. Supp. at 857–59.

138. By denying Plaintiff access to the clinical components required for graduation, Defendants breached their contractual and statutory obligations and deprived Plaintiff of the ability to complete degree requirements and obtain the benefits of enrollment in the Juris Doctor program.

## COUNT IX
### Fraud & Misrepresentation

139. Under Michigan law, fraud or fraudulent misrepresentation occurs when a party makes a material misrepresentation of fact, knowing it to be false or recklessly disregarding its truth, with the intent that the other party rely on the misrepresentation, the other party does in fact reasonably rely on it, and the other party suffers damages as a result of that reliance. A material misrepresentation is

one that a reasonable person would consider important in deciding how to act. See *Hi-Way Motor Co.* v. *Int'l Harvester Co.*, 398 Mich. 330, 336 (1976).

140. Fraud may be established by affirmative false statements or by misleading representations that create a false impression, including representations that suppress, obscure, or omit material facts where the defendant has superior knowledge or exclusive control over the relevant information. *See Hord* v. *Envtl. Research Inst. of Mich.*, 463 Mich. 399, 412 (2000); *M & D, Inc.* v. *W.B. McConkey*, 231 Mich. App. 22, 27 (1998). Where one party possesses exclusive control over billing, financial aid administration, transcript generation, or recordkeeping, misrepresentations concerning those matters are actionable when made to induce continued enrollment or financial commitment. See *Titan Ins. Co.* v. *Hyten*, 491 Mich. 547, 555–56 (2012).

141. Michigan courts further recognize that a plaintiff's reliance is reasonable where the defendant possesses superior knowledge and the plaintiff lacks an independent means of verifying the truth of the representation. See *Novak* v. *Nationwide Mut. Ins. Co.*, 235 Mich. App. 675, 690 (1999).

142. Here, Defendants made material misrepresentations of fact regarding the cost, grading treatment, and financial aid implications of repeated coursework. Defendants represented to Plaintiff that certain repeated courses would be provided "at no cost," while simultaneously billing tuition, applying federal financial aid funds, and recording transcript outcomes in a manner that obscured whether

courses were passed, failed, or repeated. These representations concerned matters central to Plaintiff's financial obligations, academic standing, and ability to complete degree requirements and were therefore material. See *Hi-Way Motor*, 398 Mich. at 336.

143. Defendants knew or recklessly disregarded the falsity of these representations. Defendants exercised exclusive control over academic billing practices, tuition assessment, transcript notation, and the administration of Title IV federal financial aid. As a result, Defendants either knew or should have known that representations regarding the cost and academic treatment of repeated coursework were inaccurate or misleading. Fraud may be inferred where a defendant makes representations about matters within its exclusive control while possessing contrary information. *See Hord,* 463 Mich. at 412; *Titan Ins.*, 491 Mich. at 555–56.

144. Defendants made these representations with the intent that Plaintiff rely on them in deciding whether to remain enrolled, repeat coursework, pursue academic appeals, and continue investing time and financial resources toward completion of the Juris Doctor program. Intent to induce reliance may be inferred from the circumstances where representations are made to secure continued performance or financial commitment. See *M & D, Inc.*, 231 Mich. App. at 27.

145. Plaintiff reasonably relied on Defendants' representations by continuing her enrollment, repeating coursework under the belief that it would not incur additional cost, and foregoing alternative educational or employment opportunities. Plaintiff

had no independent ability to verify the accuracy of Defendants' representations regarding billing, transcript notation, or financial aid application and was entitled to rely on information provided by the institution administering those systems. See *Novak*, 235 Mich. App. at 690.

146. As a direct and proximate result of Defendants' misrepresentations, Plaintiff suffered damages, including loss and delay of federal financial aid eligibility, improper tuition charges, distorted academic records, delayed degree completion, and resulting financial and professional harm. Such economic and professional injuries constitute recoverable damages under Michigan fraud law. *See Hord*, 463 Mich. at 412.

147. Defendants' conduct therefore constitutes fraud or fraudulent misrepresentation under Michigan law.

## <u>COUNT X</u>
### Unjust Enrichment

148. Under Michigan law, a claim for unjust enrichment arises when (1) the defendant receives a benefit from the plaintiff, and (2) it would be inequitable for the defendant to retain that benefit without payment or restitution. The doctrine applies where the defendant's retention of the benefit violates principles of equity and good conscience. *See Kammer Asphalt Paving Co.* v. *East China Twp. Schs.*, 443 Mich. 176, 185 (1993); *Belle Isle Grill Corp.* v. *City of Detroit*, 256 Mich. App. 463, 478 (2003).

149. Unjust enrichment is an equitable remedy designed to prevent a party from profiting at another's expense when no valid justification exists for retaining the benefit. Where a party receives payment or financial benefit but fails to provide the promised or reasonably expected value in return, restitution may be required to avoid unjust enrichment. See *Morris Pumps* v. *Centerline Piping, Inc.*, 273 Mich. App. 187, 194 (2006). Although unjust enrichment generally does not apply where an express contract governs the same subject matter, it may be pled in the alternative where the validity or scope of the contract is disputed or where equity otherwise requires restitution. See *Belle Isle Grill*, 256 Mich. App. at 478.

150. Here, Defendants received and retained substantial benefits from Plaintiff, including tuition payments, the application of federal financial aid funds, and the economic value associated with Plaintiff's continued enrollment in the Juris Doctor program. These benefits were conferred directly by Plaintiff and were knowingly accepted and retained by Defendants. *See Kammer Asphalt*, 443 Mich. at 185.

151. Defendants obtained and retained these benefits under circumstances that render their retention inequitable. While accepting tuition and federal financial aid funds, Defendants misrepresented the cost and treatment of repeated coursework, denied Plaintiff meaningful academic and financial aid review, and excluded Plaintiff from educational programs through involuntary medical leave and withdrawal reporting. As a result, Plaintiff did not receive the educational services,

41

degree progress, or academic opportunities promised in exchange for the funds retained by Defendants.

152. Despite retaining the financial benefits of Plaintiff's enrollment, Defendants deprived Plaintiff of access to academic instruction, required clinical education, and the opportunity to complete the Juris Doctor degree. Michigan courts have recognized that unjust enrichment may lie where a defendant retains payment while failing to provide the bargained-for value. See *Morris Pumps*, 273 Mich. App. at 194.

153. Plaintiff therefore conferred benefits on Defendants without receiving the corresponding educational value contemplated by the parties' relationship. Under these circumstances, equity and good conscience require restitution. See *Belle Isle Grill*, 256 Mich. App. at 478.

154. Defendants' retention of tuition payments, financial aid proceeds, and enrollment-related benefits while denying Plaintiff access to the educational services underlying those payments constitutes unjust enrichment under Michigan law.

## <u>COUNT XI</u>
### Higher Education Act (Declaratory / Injunctive Only)

155. Although the Higher Education Act ("HEA") does not create a private right of action for money damages, courts have recognized that declaratory and injunctive relief may be available to address ongoing or imminent violations of federal

funding requirements where an educational institution receives and administers federal financial aid in a manner inconsistent with statutory and regulatory obligations. See *Cannon* v. *Univ. of Chi.*, 441 U.S. 677, 706–08 (1979) (recognizing that absence of a damages remedy does not foreclose equitable relief to enforce federal funding conditions).

156. Institutions that participate in Title IV federal student aid programs are required to comply with the conditions attached to that funding, including regulations governing billing practices, satisfactory academic progress, enrollment status reporting, withdrawal determinations, refund calculations, and record accuracy. *See* 20 U.S.C. §§ 1070–1099d; 34 C.F.R. pts. 668, 682, 685. When an institution's administration of federal financial aid is inconsistent with HEA requirements and implementing regulations, and those practices result in continuing or future harm, equitable relief may be appropriate to compel compliance, correct inaccurate records, and prevent further statutory violations. See *Armstrong* v. *Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327–28 (2015) (recognizing availability of equitable relief to enjoin unlawful administration of federal funding schemes absent express congressional preclusion).

157. Federal courts have repeatedly acknowledged that while the HEA does not authorize private damages actions, institutions remain subject to judicial oversight through equitable remedies where unlawful practices affect federally protected

interests. See *McCulloch* v. *PNC Bank Inc.*, 298 F.3d 1217, 1226 (11th Cir. 2002);

*Parks Sch. of Bus., Inc.* v. *Symington*, 51 F.3d 1480, 1484–85 (9th Cir. 1995).

158. Here, Defendants receive and administer federal financial aid under Title IV of the Higher Education Act and are therefore subject to the statutory and regulatory conditions governing eligibility, billing, academic progress, withdrawal reporting, and refund practices. Defendants' participation in Title IV programs obligates them to administer federal aid accurately, transparently, and in accordance with federal law and Department of Education regulations. *See* 34 C.F.R. §§ 668.22, 668.34, 668.41.

159. Defendants failed to administer federal financial aid in a manner consistent with these obligations. As described above, Defendants applied federal financial aid funds to repeated coursework while simultaneously representing that such courses would be provided "at no cost." Defendants further failed to provide required appeal and review procedures related to academic status and financial aid determinations, altered or obscured transcript and academic status reporting, and reported Plaintiff as withdrawn rather than on leave. This reporting triggered loan repayment obligations and adverse financial consequences for Plaintiff.

160. Federal courts have recognized that inaccurate enrollment status reporting and improper withdrawal determinations may constitute violations of HEA regulations and justify equitable relief where they result in continuing harm to a student's financial aid status. See *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633,

650–51 (7th Cir. 2015) (recognizing improper administration of Title IV obligations as unlawful conduct subject to judicial scrutiny).

161. Defendants' practices resulted in inaccurate reporting to federal authorities, improper application and refunding of federal financial aid, and harm to Plaintiff's financial aid status, eligibility, and repayment obligations. These deficiencies were not isolated clerical errors but reflected systemic failures in Defendants' administration and reporting of federal aid, creating ongoing and future harm absent judicial intervention.

162. Plaintiff therefore seeks declaratory relief that Defendants' financial aid administration and reporting practices violated the Higher Education Act and its implementing regulations, and injunctive relief requiring Defendants to correct Plaintiff's academic and financial aid records, remedy improper withdrawal and billing determinations, and bring their financial aid practices into ongoing compliance with federal law.

## COUNT XII
### Negligent Supervision

163. Under Michigan law, an employer or institutional defendant may be held liable for negligent supervision and retention when it knew or should have known of an employee's unfitness, incompetence, or wrongful conduct and failed to take reasonable steps to supervise, control, or prevent foreseeable harm resulting from that conduct. Liability arises where the defendant's failure to reasonably supervise

or retain an employee creates a foreseeable risk of harm to others within the scope of the employee's authority. *See Mueller* v. *Brannigan Bros. Rests. & Taverns, LLC*, 323 Mich. App. 566, 572–73 (2018)*; Brown* v. *Brown*, 478 Mich. 545, 552 (2007).

164. An institution owes a duty to exercise reasonable care in supervising employees and agents who are entrusted with discretionary authority affecting others' rights or interests. Michigan courts have recognized that negligent supervision and retention claims are particularly appropriate where employees are granted significant discretionary power and the institution fails to intervene despite knowledge of improper conduct. See *Doe v. Henry Ford Health Sys.*, 308 Mich. App. 592, 602–03 (2014).

165. An institution's duty is triggered when it becomes aware, or reasonably should become aware, of improper, harmful, or unlawful conduct by its employees. Failure to take reasonable corrective action under such circumstances may constitute negligent supervision and retention. *See Mueller*, 323 Mich. App. at 573; *Zsigo* v. *Hurley Med. Ctr.*, 475 Mich. 215, 226–27 (2006).

166. Here, Defendants owed Plaintiff a duty to reasonably supervise and oversee their employees, administrators, faculty, and agents who exercised discretionary authority over Plaintiff's academic status, disciplinary proceedings, medical leave determinations, financial aid administration, and academic records. Such authority

carried a foreseeable risk of harm if exercised improperly or without oversight. See *Doe*, 308 Mich. App. at 602–03.

167. Defendants knew or should have known that certain employees and agents were engaging in conduct that posed a foreseeable risk of harm to Plaintiff. This conduct included mishandling academic appeals, escalating Plaintiff's protected complaints into disciplinary and medical actions, relying on non-diagnostic and stigmatizing characterizations of Plaintiff's mental health, restricting Plaintiff's speech, and administering financial aid and withdrawal reporting in a manner inconsistent with institutional policy and applicable law. The persistence and escalation of this conduct placed Defendants on notice of the need for corrective supervision. See *Mueller*, 323 Mich. App. at 573.

168. Despite this knowledge, Defendants failed to take reasonable steps to supervise, correct, or prevent such conduct. Rather than intervening, Defendants permitted employees and agents to continue exercising unchecked discretion over Plaintiff's enrollment status, academic standing, access to programs, and financial aid eligibility. Michigan courts have held that allowing known or foreseeable misconduct to continue unchecked supports liability for negligent supervision and retention. *See Zsigo*, 475 Mich. at 226–27.

169. As a direct and proximate result of Defendants' failure to reasonably supervise and retain their employees and agents, Plaintiff suffered foreseeable harm, including exclusion from her educational program, loss of academic and clinical

opportunities, financial injury, and emotional distress. These harms were within the scope of risk created by Defendants' failure to supervise employees entrusted with authority over Plaintiff's education and financial status. Defendants are therefore liable for negligent supervision and retention under Michigan law. See *Brown*, 478 Mich. at 552.

## COUNT XIII
### Intentional Infliction of Emotional Distress

170. Under Michigan law, intentional infliction of emotional distress ("IIED") occurs when a defendant engages in extreme and outrageous conduct that intentionally or recklessly causes severe emotional distress to another, and the resulting distress is so severe that no reasonable person could be expected to endure it. See *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 602 (1985). Conduct is considered "extreme and outrageous" when it goes beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community. *See Doe* v. *Mills*, 212 Mich. App. 73, 91 (1995).

171. Liability does not arise from mere insults, indignities, or ordinary disputes. However, Michigan courts have recognized that conduct may be sufficiently extreme and outrageous where a defendant abuses a position of power or authority, exploits a known vulnerability, or engages in a pattern of coercive or punitive conduct. *See Graham* v. *Ford*, 237 Mich. App. 670, 675–76 (1999); *Linebaugh* v. *Sheraton Mich. Corp.*, 198 Mich. App. 335, 343 (1993). Where the defendant is

48

aware of the plaintiff's emotional susceptibility, that awareness may support a finding of recklessness or intent. *See Doe*, 212 Mich. App. at 91.

172. Here, Defendants engaged in extreme and outrageous conduct by escalating Plaintiff's protected complaints into disciplinary action, cancelling established academic and disciplinary procedures, and forcibly removing Plaintiff from her legal education through involuntary medical leave based on stigmatizing, non-diagnostic characterizations of her mental health.

173. Defendants acted intentionally or, at a minimum, with reckless disregard for the probability that their conduct would cause severe emotional distress. Defendants imposed involuntary medical leave without individualized assessment, denied Plaintiff a meaningful opportunity to be heard, restricted Plaintiff's speech, barred Plaintiff from campus, and reported her as withdrawn in a manner that jeopardized her financial aid, academic standing, and professional future. Michigan courts have found that misuse of institutional or professional authority in a manner that isolates or punishes an individual may satisfy the extreme-and-outrageous standard. See *Graham*, 237 Mich. App. at 675–76.

174. Defendants' conduct occurred while Plaintiff was experiencing known personal and emotional hardship and after Plaintiff sought assistance, transparency, and procedural fairness rather than disciplinary escalation. Rather than responding with support or lawful process, Defendants exercised institutional power to isolate, stigmatize, and exclude Plaintiff. The cumulative and coercive nature of these

actions went well beyond ordinary academic decision-making and constitutes conduct that a reasonable person could find extreme and outrageous. *See Linebaugh*, 198 Mich. App. at 343 (recognizing that repeated or cumulative conduct may support IIED).

175. As a direct and proximate result of Defendants' conduct, Plaintiff suffered severe emotional distress, including anxiety, humiliation, isolation, and emotional harm of a nature and severity that no reasonable person could be expected to endure. Michigan courts have recognized that severe emotional distress may be established where a plaintiff experiences prolonged psychological harm resulting from abuse of authority. *See Roberts*, 422 Mich. at 608.

176. Defendants are therefore liable for intentional infliction of emotional distress under Michigan law.

## V. PRAYER FOR RELIEF

177. A declaration that Defendants violated the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the Michigan Persons with Disabilities Civil Rights Act by excluding Plaintiff from participation in Defendants' educational programs on the basis of actual and/or perceived disability and by retaliating against Plaintiff for engaging in protected activity.

178. A declaration that Defendants breached their contractual and procedural obligations owed to Plaintiff under Defendants' student handbook, academic policies, and published representations.

179. A declaration that any agreement purporting to waive Plaintiff's statutory rights under federal or Michigan law is unenforceable as a matter of law.

180. Plaintiff requests prospective and restorative equitable relief, including:

    a.  An order requiring Defendants to correct Plaintiff's academic records, transcript entries, enrollment status, and federal financial aid reporting to accurately reflect Plaintiff's academic standing and to remove any adverse notations resulting from Defendants' unlawful conduct.

    b.  An order requiring Defendants to recognize and restore all academic credit hours earned by Plaintiff prior to her involuntary removal.

181. An order requiring Defendants to reinstate Plaintiff as a student in good standing, or, in the alternative, to provide Plaintiff a lawful and non-discriminatory path to completion of degree requirements, consistent with federal disability law and Defendants' published policies.

182. An order requiring Defendants to provide Plaintiff access to required clinical or experiential education through reasonable alternatives or accommodations, consistent with accreditation standards and Defendants' past practices.

183. An order enjoining Defendants from conditioning Plaintiff's educational access or degree completion on the waiver of statutory rights, silence, or non-disclosure agreements.

184. An award of compensatory damages for economic losses, including but not limited to:

a. Delayed or denied degree completion;

b. Loss or interruption of federal financial aid eligibility;

c. Tuition-related losses and improper charges;

d. Out-of-pocket expenses incurred as a result of Defendants' conduct.

185. An award of compensatory damages for non-economic harm, including emotional distress, humiliation, reputational injury, and disruption of Plaintiff's professional trajectory.

186. An award of costs and litigation expenses as permitted by statute, together with any other relief available under applicable law.

187. Such other and further relief as the Court deems just and equitable.

## VI. Jury Trial

188. Respectfully, Plaintiff demands a trial by jury on all issues so triable.

Submitted,

s/Shelby Campbell

Pro Se

1420 Washington  Blvd

Suite 301

Detroit, MI 48226

3139093152

shelbysoup@gmail.com

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

## DEFENDANTS

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government
   Plaintiff

☐ 3 Federal Question
   *(U.S. Government Not a Party)*

☐ 2 U.S. Government
   Defendant

☐ 4 Diversity
   *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

### CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

### REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### TORTS

**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
☐ 365 Personal Injury - Product Liability
☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 448 Education

### PRISONER PETITIONS

**Habeas Corpus:**
☐ 463 Alien Detainee
☐ 510 Motions to Vacate Sentence
☐ 530 General
☐ 535 Death Penalty
**Other:**
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

### LABOR
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Management Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical Leave Act
☐ 790 Other Labor Litigation
☐ 791 Employee Retirement Income Security Act

### IMMIGRATION
☐ 462 Naturalization Application
☐ 465 Other Immigration Actions

### BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☐ 835 Patent - Abbreviated New Drug Application
☐ 840 Trademark
☐ 880 Defend Trade Secrets Act of 2016

### SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
☐ 375 False Claims Act
☐ 376 Qui Tam (31 USC 3729(a))
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit (15 USC 1681 or 1692)
☐ 485 Telephone Consumer Protection Act
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/ Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information Act
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____

DOCKET NUMBER _____

DATE _____

SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____